

Christopher B. Kende (CK-0632)
Christopher Raleigh (CR-9366)
COZEN O'CONNOR
Attorneys for Plaintiffs
45 Broadway Atrium - 16th Floor
New York, New York 10006
(212) 509-9400

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————x

ESSEX INSURANCE COMPANY,

        Plaintiff,

        -against-

CARNIVAL CORPORATION,

        Defendant.
—————————————————————————x

**JUDGE CASTEL**

**07 CIV 4653**

Civil Action No.

**DECLARATORY JUDGMENT COMPLAINT**

Plaintiff, Essex Insurance Company, by its attorneys, Cozen O'Connor, as and for its Complaint for Declaratory Judgment against the defendant, Carnival Corporation, alleges upon information and belief as follows:

## JURISDICTION

1.     This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332, insofar as this action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceed $75,000.

## THE PARTIES

2.     At all times material hereto, Essex Insurance Company ("Essex") was and is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 4521 Highwoods Parkway, Glen Allen, Virginia.

3.  At all times material hereto, defendant, Carnival Corporation ("Carnival"), is a foreign corporation organized and existing under the laws of Panama, with an office and principal place of business located at 3655 N.W. 87th Avenue, Miami, Florida, and is engaged in business as a cruise ship company.

4.  This Court has *in personam* jurisdiction over Carnival, insofar as the company is authorized by the New York Secretary of State to conduct business in the State of New York.

## FACTS

5.  In the spring of 2005, Carnival, through its broker, Marsh USA, Inc. ("hereinafter, "Marsh"), sought renewal of an all-risk policy covering the period May 1, 2005 through May 1, 2006, to which Essex, in addition to other insurers, was to be a subscribing insurer.

6.  The renewal sought coverage for additional properties that had been recently acquired by Carnival, including two properties located in Cozumel, Mexico, and which had not been scheduled under the policy covering the May 1, 2004 – May 1, 2005 period.

7.  Marsh identified the properties in Cozumel on a "Statement of Values" dated May 1, 2005, in which it reportedly declared the values to be $8,575,000 for the Old & New Marine Terminal/Installation and $18,134,000 for the Marine Terminal.

8.  The Statement of Values dated May 1, 2005 was provided by Marsh to Essex and the other subscribing insurers during the course of its application for renewal of its policy.

9.  After premium quotes submitted by Essex and the other subscribing insurers were negotiated and accepted by Marsh, the policy terms and conditions, which were set forth in a CAR Manuscript form that had been prepared by Marsh on behalf of Carnival, was provided to Essex and the other subscribing insurers on or about August 15, 2005.

10. Essex executed and issued the CAR Manuscript form provided by Marsh (the "Master Policy"), which set forth the respective participation of each subscribing insurer on a Subscription Page appended to each policy, a true and accurate copy of which is annexed hereto as Exhibit A.

11. The participation of Essex, as set forth on the Subscription Page annexed hereto as Exhibit A, is excess of the first $25 million.

12. The Master Policy issued by Essex also has an "occurrence limit of liability" endorsement, which states in pertinent part as follows:

> It is understood and agreed that the following special terms and conditions apply to this policy:
>
> * * *
>
> 2. <u>The premium for this policy is based upon the statement of values on file with the company</u>, or attached to this policy. <u>In the event of loss hereunder liability of the company shall be limited to</u> the least of the following:
>
>> A. The actual adjusted amount of loss, less applicable deductibles.
>>
>> B. <u>The total stated value for the property involved, as shown on the statement of values on file with the company</u>, less applicable deductible(s).
>>
>> C. The limit of liability or amount of insurance shown on the face of this policy or endorsed into this policy. (emphasis supplied)

13. The Master Policy contemplated the possibility that coverage might have to be provided in foreign countries which required that insurance for property therein could only be furnished by locally admitted insurers and that insurance by non-admitted insurers would be illegal.

14. In order to comply with the laws of foreign countries which only allowed the issuance of insurance policies by local insurers, the Master Policy provided that property located

3

in such countries was expressly excluded from coverage. Specifically, the Master Policy provided at Paragraph 6 as follows:

> <u>The property covered by this policy is that which is situated worldwide (except where providing coverage is, or may be, prohibited by law</u>, or as may be excluded) as per schedule of locations on file as of 4/5/05...(emphasis supplied)

15. The Master Policy furthermore provided that coverage for property located in foreign countries, which was excluded from coverage under the Master Policy, would be covered through insurance placed with locally admitted insurers.

16. The language of the Master Policy which gives effect to the principal set forth in paragraph 15 of this Complaint is found at Paragraph 13 of the Master Policy, and states in pertinent part as follows:

> <u>The insurance provided by this (Master) policy is not to apply as direct contributing insurance as respects loss arising from the perils insured under any applicable primary "Locally Admitted" policies.</u> In the event of loss from a single Occurrence involving this (Master) policy and any applicable primary "Locally Admitted" policy(ies), the Limits of Liability payable by any combination of these policies shall not exceed the Limits/Sublimits of Liability of this (Master) policy.
>
> It is a condition of this (Master) policy that all applicable primary "Locally Admitted" policy(ies) in force at the inception of the (Master) policy, will be maintained in full force and effect during the term of this (Master) policy. Any renewals or replacement of applicable primary "Locally Admitted" policies will not be more restrictive than the previous prevailing coverage. (emphasis supplied)

17. Additional language in the Master Policy which implements the principal set forth in paragraph 15 of this Complaint is found in Paragraph 14 of the Master Policy, which is captioned "**Nonadmitted Insurance**" and states in pertinent part as follows:

> <u>The insured acknowledges and recognizes, by accepting this policy that the insurance provided by this policy may be considered to be nonadmitted insurance in some of the countries in which coverage is provided. In such countries the Insured may have to</u>

<u>purchase compulsory insurance from locally admitted, indigenous insurance carriers</u> and the Companies will not be responsible for any fines, penalties, taxes or other costs imposed by any jurisdiction on any party for the Insured's failure to do so.

Where this policy is nonadmitted insurance, the Companies are not responsible for providing any locally required bonds, Certificates of Insurance, Loss Payable Endorsements, Mortgagee Endorsements or any other documents as evidence of insurance.

<u>This policy does not substitute for any local compulsory insurance which may be required by any jurisdiction and the placement of such compulsory insurance is the responsibility of the Insured or its agent</u>. (emphasis supplied)

18.     Mexico is a country which prohibits the issuance of policies of insurance by non-admitted insurers, a fact which would have made it illegal in Mexico for Essex to directly provide coverage for Carnival's property in Cozumel under the Master Policy.

19.     In order to legally provide insurance coverage for Carnival's property in Cozumel, certain subscribers of the Master Policy, specifically Industrial Risk Insurers, Commonwealth, Arch and Scor, an affiliate of General Security Indemnity Company of Arizona, (collectively, the "Reinsurers"), agreed to reinsure a policy to be issued by a Mexican insurer, Grupo Nacional Provincial ("GNP"), which was intended to cover 60% of $10,000,000, the "Sum Insured" requested by Marsh on behalf of Carnival. Another subscriber to the Master Policy, Lexington Insurance Company, agreed to reinsure AIG Mexico, which covered the remaining 40% of the "Sum Insured" of $10,000,000.

20.     Essex did not participate in the reinsurance of the Mexican policy and did not intend to provide any insurance coverage for Carnival's properties in Mexico.

21.     On October 21-22, 2005, Carnival's properties in Cozumel were damaged as a result of exposure to Hurricane Wilma.

22. In December, 2005, and again in January, 2006, after Carnival's Cozumel properties had sustained damage from Hurricane Wilma, Marsh notified GNP that it wished to amend the "Sum Insured" of $10,000,000 to reflect a higher limit of $23,734,000 for Carnival's properties in Mexico on the grounds that the "Sum Insured" of $10,000,000 had been a mistake.

23. The Reinsurers agreed to Marsh's request and instructed GNP to retroactively amend the local policy to provide coverage for 60% of the higher limit of $23,734,000. The actual policy of insurance was issued by GNP in late 2006, more than a year after the loss.

24. Essex still did not participate in the reinsurance of the Mexican policy, for which the Sum Insured had been increased at Marsh's request, nor did Essex intend to provide any insurance coverage for Carnival's properties in Mexico.

25. The value of the loss which has been sustained as a result of Hurricane Wilma is still being calculated and adjusted but, upon information and belief, the value of the claim is estimated to be $41,000,000 to date.

26. Carnival has presented Partial Proofs of Loss to AIG Mexico and GNP in the respective amounts of $6,000,000 and $9,000,000, along with a request for a partial advance in payment of same. The requested partial advance was funded by the Reinsurers and paid by GNP to Carnival's Mexican subsidiary.

27. Carnival, through its broker, Marsh, has sought coverage from Essex under the Master Policy with respect to Carnival's property in Cozumel.

28. There presently exists a current and ongoing dispute as to whether Essex is obligated under the Master Policy to respond to any loss in Mexico.

## FIRST CAUSE OF ACTION FOR DECLARATORY JUDGMENT

29. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 28 with the same force and effect as if set forth at length herein.

30. By reason of the aforementioned facts, Essex alleges that Carnival's properties in Cozumel are excluded from coverage under the Master Policy, that the exclusive policy providing coverage for the Cozumel properties is the GNP policy and that Carnival's recovery for losses sustained by reason of damage caused by Hurricane Wilma to the Cozumel properties is limited to the liability limit of 60% of the $23,734,000 provided for by the GNP policy and that a controversy exists between the parties with respect to Carnival's claim for payment of an amount in excess of the GNP policy limit.

31. Declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist between the parties, particularly with respect to whether the Cozumel properties are excluded from coverage by the Master Policy and that Carnival's recovery should be limited to the coverage provided under the GNP policy.

## SECOND CAUSE OF ACTION FOR DECLARATORY JUDGMENT

32. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 28 with the same force and effect as if set forth at length herein.

33. The Master Policy issued by Essex has an "occurrence limit of liability" endorsement which, in accordance with the policy language set forth in paragraph 12 of this Complaint, limits the liability of Essex to the total stated value of the property involved, as shown on the statement of values on file with the company, less any applicable deductibles.

34. The values declared by Carnival on the May 1, 2005 Statement of Values it submitted to Essex were $8,575,000 for the Old & New Marine Terminal/Installations and $18,134,000 for the Marine Terminal.

35. The value declared by Carnival of $8,575,000 for the property described as "Old & New Marine Terminal/Installation" on the May 1, 2005 Statement of Values is below the $25 million point at which Essex's coverage attached under the Master Policy.

36. The value declared by Carnival of $18,134,000 for the property described as "Marine Terminal" on the May 1, 2005 Statement of Values is below the $25 million point at which Essex's coverage attached under the Master Policy.

37. By reason of the above, Essex alleges that Carnival's recovery for losses sustained by reason of damage caused by Hurricane Wilma is limited by the aforementioned "occurrence limit of liability" endorsement to amounts which are less than the point at which Essex's liability attaches under the Master Policy.

38. Declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist between Essex and Carnival, particularly with respect to whether Essex is required to provide coverage for an amount which exceeds its proportionate share of the values declared by Carnival on its Statement of Values.

### THIRD CAUSE OF ACTION FOR DECLARATORY JUDGMENT

39. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 28 with the same force and effect as if set forth at length herein.

40. The Statement of Values submitted by Marsh to Essex and the other subscribing insurers represented that the value of Carnival's properties in Cozumel was $8,575,000 for the Old & New Marine Terminal/Installations and $18,134,000 for the Marine Terminal.

41. Carnival misrepresented the value of its properties in Cozumel, which values Essex relied upon in good faith in its calculation of premium and the attachment point of $25,000,000, the amount at which its participation in the layers of coverage begins, as set forth in the Subscription Page annexed hereto as Exhibit A.

42. The claim that will be submitted by Carnival, which is now estimated to be $41,000,000, will significantly exceed the values declared by Carnival in the Statement of Values furnished by Marsh to Essex in support of its application for renewal of the Master Policy.

43. By reason of the above, a controversy exists whether a material misrepresentation of fact as to valuation of the property was made by Carnival and, if so, whether Essex is entitled to demand rescission of the Master Policy.

### FOURTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT

44. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 28 with the same force and effect as if set forth at length herein.

45. A portion of the claim submitted by Carnival includes reconstruction of the pier at the Cozumel Terminal which is used for the loading and disembarking of passengers from Carnival's vessels.

46. Following the terrorist attack against the World Trade Center on September 11, 2001, the International Ship and Port Facility Security code ("ISPS code") was promulgated by

the Maritime Safety Committee of the International Maritime Organization ("IMO") in order to improve vessel and port security, to which Mexico is a signatory.

47. With respect to port facilities, the ISPS Code requires that the contracting government "establish separate locations for checked and unchecked persons and their effects and if possible separate areas for embarking disembarking passengers, ship's personnel and their effects, to insure that unchecked persons are not able to come in contact with checked persons."

48. Carnival has represented to Essex and the other subscribing insurers that it was not required to construct a separate pier because same had been constructed before September 11, 2001 and that the ISPS Code did not require that Carnival change the configuration.

49. Following damage to the pier that was caused by Hurricane Wilma, Carnival's security consultant has recommended that Carnival construct a separate pier for use solely by excursion vessels ("Shorex Pier") in accordance with the ISPS Code requirements.

50. As a result of the recommendation of its consultant, Carnival has advised Essex and the other subscribing insurers that it intends to include the cost of constructing the Shorex Pier as part of its claim, the cost of which has been estimated to be at least $2 million.

51. Upon information and belief, and contrary to the representation of its security consultant, Carnival had not been given an exemption from the construction of a Shorex Pier but had instead been given an extension of time by Mexico to construct same, and that the time to construct the Shorex Pier would have expired in 2007.

52. By reason of the above, the cost of building the Shorex Pier is not the result of Hurricane Wilma or any other fortuitous occurrence, and should accordingly be excluded from coverage because it is an expense which Carnival would have been required to incur if the loss and damage caused by Hurricane Wilma had not occurred.

53. Declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist between the parties with respect to the Plaintiff's liability for payment of the cost of construction of the Shorex Pier.

## FIFTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT

54. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 28 with the same force and effect as if set forth at length herein.

55. The claim submitted by Carnival seeking reimbursement for reconstruction of damaged structures has been based upon the replacement cost that is expected to be incurred.

56. The Master Policy provides that replacement costs can be recovered only if the affected structures are rebuilt or repaired within two years from the date of the loss. Specifically, section III A of the Master Policy provides in pertinent part as follows:

> **Property Valuation and** Recovery – Loss or damage shall be valued (at the time and place of the loss) as follows:
>
> A. Buildings and structures…<u>if repaired, rebuilt, or replaced within two (2) years from the date of loss or damage</u>, at the same or at another site (within the same country), the amount of recovery shall be the smaller of the following -
>
> 1. the cost to repair, rebuild or replace on the same site with new materials of like kind and quality, whichever is the smallest; or
>
> 2. the actual expenditure incurred in repairing, rebuilding or replacing on the same or another site, whichever is the smallest.
>
> \*     \*     \*     \*     \*
>
> If the damaged property is not repaired, rebuilt or replaced the amount of recovery shall not exceed the actual cash value of the damaged property at the time of loss or damage after taking into account all allowances for depreciation.

57. Upon information and belief, the construction contemplated by Carnival will not be completed by October 22, 2007, the date which is two years after the date of the loss.

11

58. By reason of the above, any recovery by Carnival for damage or loss to property which has not been re-built, repaired or reconstructed before October 22, 2007 should be based upon the actual cash value of the property at the time and place of the loss.

59. Declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist between the parties, particularly with respect to whether Carnival is entitled to recover replacement costs for the re-building and reconstruction of buildings and structures after October 22, 2007.

### SIXTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT

60. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 28 with the same force and effect as if set forth at length herein.

61. The Master Policy issued by Essex contained a "Pollution and Pollutants Clean-up and Removal Endorsement" which states in pertinent part as follows with respect to debris removal:

> The total liability for debris removal expense shall not exceed $100,000 in the aggregate for the sum of all such expenses incurred during each separate twelve-month period of this policy, nor will this insurance cover debris removal expenses reported to the company more than one-hundred eighty (180) days after date of direct loss or the expiration of this policy.

62. Based on the information available at this time, it is estimated that debris removal expenses incurred by Carnival will exceed $10,000,000.

63. In the event the Court determines that Carnival is entitled to recover any amount from Essex under the Master Policy, which is denied, then the maximum liability of Essex for any covered debris removal expenses recovered by Carnival is its proportionate share of $100,000 less any applicable deductible.

64. Declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist between Essex and Carnival, particularly with respect to whether Essex is required to provide coverage for an amount which exceeds its proportionate share of the $100,000 limit on debris removal expenses.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment declaring that the Cozumel properties are excluded from coverage by the Master Policy and that Carnival's recovery should be limited to 60% of the liability limit of $23,734,000 provided for by the GNP policy; alternatively, in the event the Court finds there is coverage under the Master Policy, which is denied, then Essex respectfully requests that this Court enter judgment as follows:

a. Declaring that the maximum liability of Essex for any compensable loss recovered by Carnival under the Master Policy is limited by the "occurrence limit of liability" endorsement to amounts which are less than the point at which Essex's liability attaches under the Master Policy.

b. Declaring that Carnival had misrepresented the values of its properties in Cozumel in the Statement of Values it submitted to Essex and the other subscribing insurers, that this constituted a material misrepresentation of fact and that Essex is entitled to rescission of the Master Policy by reason of same.

c. Declaring that the cost of building the Shorex Pier should be excluded from coverage because it does not constitute a fortuitous loss but, to the contrary, was an inevitable expense which Carnival would have been required to incur if the loss occasioned by Hurricane Wilma had not occurred.

 d. Declaring that any recovery by Carnival for damage or loss to property which has not been re-built, repaired or reconstructed by October 22, 2007 is limited to the actual cash value of the property at the time and place of the loss;

 e. Declaring that any recovery by Carnival for debris removal expenses is limited to its proportionate share of $100,000 less any applicable deductibles.

 f. Awarding to Plaintiff the costs of this action and such other and further relief as the Court deems just and proper under the circumstances.

Dated: New York, New York
   June 1, 2007

            COZEN O'CONNOR
            Attorneys for Plaintiffs

By: _____
    Christopher B. Kende (CK-0632)
    Christopher Raleigh (CR 9366)
    45 Broadway - 16th Floor
    New York, New York 10006
    (212) 509-9400

# SUBSCRIPTION PAGE

In consideration of the premium charged, the subscribers hereto, hereinafter referred to as the insurers, do severally, but not jointly, agree to indemnify the Insured for the amount recoverable in accordance with the terms and conditions of this Policy, provided that:

1. The collective liability of Insurers shall not exceed the Limit of Liability or any appropriate Sublimit of Liability or any Annual Aggregate limit.
2. The liability of each of the Insurers shall not exceed the Limit to the pro-rata percentage of liability sat against its name.

**Insured:** Carnival Corporation & plc

**Policy Limit:** Subject to all the terms and conditions of the Policy and the Endorsements

| Insurers | Policy No. | Participation | Annual Layer Premium (100%) | Signature |
|---|---|---|---|---|
| Illinois Union Insurance Company (non-admitted) | n/a | 0.0% of Primary $25M | $1,100,000 | |
| | D3590427A 001 | 27.5% of $50M xs $25M | $ 450,000 | |
| | D35904232 001 | 18.5% of $75M xs $75M | $ 75,000 | |
| Arch Specialty Insurance Company (non-admitted) | PRP000 7453-00 | 10.0% of Primary $25M | $1,100,000 | |
| | PRP000 7453-00 | 10.0% of $50M xs $25M | $ 450,000 | |
| | PRP000 7453-00 | 30.0% of $75M xs $75M | $ 75,000 | |
| Commonwealth Insurance Company (non-admitted) | US5689 | 18.5% of Primary $25M | $1,100,000 | |
| | US5691 | 6.0% of $50M xs $25M | $ 450,000 | |
| | US5692 | 20.0% of $75M xs $75M | $ 75,000 | |
| | US5690 | 15.0% of Primary $25M – Alaska only | $ 60,000 | |
| | US5690 | 15.0% of $50M xs $25M – Alaska Only | $ included | |
| | US5690 | 15.0% of $75M xs $75M – Alaska Only | $ included | |
| Essex Insurance Company (non-admitted) | n/a | 0.0% of Primary $25M | $1,100,000 | |
| | ESP 3446 | 25.0% of $50M xs $25M | $ 450,000 | ✓ |
| | n/a | 0.0% of $75M xs $75M | $ 75,000 | |
| Westport Insurance Company (admitted) | 31-3-70785 | 16.5% of Primary $25M | $1,100,000 | |
| | 31-3-70785 | 16.5% of $50M xs $25M | $ 450,000 | |
| | 31-3-70785 | 16.5% of $75M xs $75M | $ 75,000 | |
| Lexington Insurance Company (admitted) | 8754113 | 40.0% of Primary $25M | $1,100,000 | |
| | n/a | 0.0% of $50M xs $25M | $ 450,000 | |
| | n/a | 0.0% of $75M xs $75M | $ 75,000 | |

| General Security Indemnity Company of Arizona (non-admitted) | 25F39000197-04 | 15.0% of Primary $25M – excluding Alaska | $1,100,000 | |
| | 25F39000197-04 | 15.0% of $50M xs $25M – excluding Alaska | $ 450,000 | |
| | 25F39000197-04 | 15.0% of $75M xs $75M – excluding Alaska | $ 75,000 | |

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy except as herein above set forth.

**Drop Down / Step Down:** In determining the amount of any loss, disaster, or casualty, the total loss for all coverages caused by any combination of perils, one or more of which is insured against under the primary and/or underlying capacity, shall be used even though all such perils or coverages may not be insured against under the excess capacity.

Any recoveries made under the primary and/or underlying capacity shall be considered as first applying to those perils and/or coverages not insured against the excess capacity. Upon exhaustion of the primary and/or underlying capacity and/or self-insured retention limits, this policy shall drop down and be liable for the loss in excess of the amount attributed to the primary and/or underlying capacity as respects those perils and/or coverages insured hereunder subject to the limit of the excess capacity.

In the event of reduction of the aggregate limits of liability of the primary and/or underlying capacity, the excess capacity shall step down and pay the excess of the reduced annual aggregate limit. In the event of exhaustion of the aggregate limits of liability of the primary and/or underlying capacity, the excess capacity shall continue in force as primary capacity, excess of deductibles).