UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| ESSEX INSURANCE COMPANY, | x<br>)<br>) 07 Civ. 4653 (PKC) |
| Plaintiff, | )<br>) |
| -against- | ) **DEFENDANT CARNIVAL**<br>) **CORPORATION'S ANSWERS,**<br>) **AFFIRMATIVE DEFENSES, AND** |
| CARNIVAL CORPORATION, | ) **COUNTERCLAIMS TO PLAINTIFF**<br>) **ESSEX INSURANCE COMPANY'S** |
| Defendant. | ) **COMPLAINT**<br>x |

---

Defendant Carnival Corporation ("Carnival"), by its attorneys, Dickstein Shapiro LLP, hereby answers Plaintiff Essex Insurance Company's ("Essex") Complaint as follows:

## ANSWER TO JURISDICTION

1. The allegation in Paragraph 1 is a legal conclusion to which Carnival does not respond.

## ANSWER TO PARTIES

2. The allegation in Paragraph 2 is beyond Carnival's knowledge to admit or deny.

3. Admitted that Carnival is organized under the laws of Panama, maintains a principal place of business at 3655 N.W. 87th Avenue, Miami, Florida, and is engaged in a number of businesses, including as a cruise ship company.

4. The allegation in Paragraph 4 is a legal conclusion to which Carnival does not respond.

## ANSWERS TO FACTS

5. Admitted that in the spring of 2005, through its broker, Marsh USA, Inc. ("Marsh"), Carnival sought to purchase global all-risk, first-party property insurance for all of its properties covering the period of May 1, 2005 through May 1, 2006, to which Essex and the

following insurance companies sold this coverage: Industrial Risk Insurers ("IRI"), Lexington Insurance Company ("Lexington"), Commonwealth Insurance Company ("Commonwealth"), Arch Specialty Insurance Company ("Arch"), Illinois Union Insurance Company ("Illinois Union"), and General Security Indemnity Company of Arizona, a wholly-owned subsidiary of Scor Reinsurance Company, ("SCOR/General Security") (collectively "Domestic Insurance Companies"). Otherwise denied.

6. Admitted that in the spring of 2005, Carnival sought to purchase global, all-risk, first-party property insurance, including coverage for all of its properties in Mexico, which included the Puerta Maya Pier (the "Pier") and property adjacent to it (the "Puerta Maya Property") in Cozumel, Mexico. Further admitted that the Pier and Puerta Maya Property were insured under a separate policy for the 2004 - 2005 period. Otherwise denied.

7. Admitted that there is *a* document titled "Statement of Values" that includes the values alleged in Paragraph 7. Upon information and belief there were several versions of this document that reflect different property values, which were provided to Essex and the other Domestic Insurance Companies by Marsh during the policy purchase process. Otherwise denied.

8. Carnival is without sufficient knowledge or information to form a belief concerning the allegations in Paragraph 8 and therefore these allegations are denied.

9. Carnival is without sufficient knowledge or information to form a belief concerning the allegations in Paragraph 9 and therefore these allegations are denied.

10. The terms and conditions of the Master Policy are contained therein. Otherwise denied.

11. The terms and conditions of the Master Policy are contained therein. Otherwise denied.

12. The terms and conditions of the policy sold by Essex are contained therein; the excerpted language in Paragraph 12 is incomplete. Otherwise denied.

13. The terms and conditions of the Master Policy are contained therein. Paragraph 13 also contains a legal conclusion to which Carnival does not respond. Otherwise denied.

14. The terms and conditions of the Master Policy are contained therein; the excerpted language in Paragraph 14 is incomplete. Paragraph 14 also contains a legal conclusion to which Carnival does not respond. Otherwise denied.

15. The terms and conditions of the Master Policy are contained therein. Paragraph 15 also contains a legal conclusion to which Carnival does not respond. Otherwise denied.

16. The terms and conditions of the Master Policy are contained therein; the excerpted language in Paragraph 16 is incomplete. Paragraph 16 also contains a legal conclusion to which Carnival does not respond. Otherwise denied.

17. The terms and conditions of the Master Policy are contained therein; the excerpted language in Paragraph 17 is incomplete. Paragraph 17 also contains a legal conclusion to which Carnival does not respond. Otherwise denied.

18. Paragraph 18 is a legal conclusion to which Carnival does not respond. Otherwise denied.

19. Paragraph 19 contains a legal conclusion to which Carnival does not respond. Otherwise denied.

20. Admitted that Essex did not directly reinsure the Grupo Nacional Provincial ("GNP") or AIG Mexico Policies. Otherwise denied.

21. Admitted.

22. Carnival is without sufficient knowledge or information to form a belief concerning the allegations in Paragraph 22 and therefore these allegations are denied.

23. Carnival is without sufficient knowledge or information to form a belief concerning the allegations in Paragraph 23 and therefore these allegations are denied.

24. Admitted that Essex did not directly reinsure the GNP or AIG Mexico Policies, but denied that Essex did not intend to provide any insurance coverage for Carnival's properties in Mexico. Carnival is without sufficient knowledge or information to form a belief concerning the other allegations in Paragraph 24 and therefore these allegations are denied.

25. Admitted that the value of the loss is still being calculated and adjusted and exceeds $41,000,000.

26. Admitted.

27. Admitted that Carnival has sought coverage from Essex under the Master Policy with respect to Carnival's property in Cozumel.

28. Admitted.

### ANSWER TO FIRST CAUSE OF ACTION FOR DECLARATORY JUDGMENT

29. Carnival repeats its Answers to Paragraphs 1 through 28.

30. Carnival admits that a controversy exists between the parties with respect to Carnival's claim for payment. Otherwise denied.

31. This allegation requires no response.

### ANSWER TO SECOND CAUSE OF ACTION FOR DECLARATORY JUDGMENT

32. Carnival repeats its Answers to Paragraphs 1 through 28.

33. The terms and conditions of the policy sold by Essex are contained therein; the excerpted language in Paragraph 33 is incomplete. Paragraph 33 also contains a legal conclusion to which Carnival does not respond. Otherwise denied.

34. Admitted that there is *a* document titled "Statement of Values" that includes the values alleged in Paragraph 34. Upon information and belief there were several versions of this document that reflect different property values shared with Essex by Marsh during the policy purchase process. Otherwise denied.

35. The terms and conditions of the policy sold by Essex are contained therein. Otherwise denied.

36. The terms and conditions of the policy sold by Essex are contained therein. Otherwise denied.

37. Denied.

38. This allegation requires no response.

### ANSWER TO THIRD CAUSE OF ACTION FOR DECLARATORY JUDGMENT

39. Carnival repeats its Answers to Paragraphs 1 through 28.

40. Admitted that there is *a* document titled "Statement of Values" that includes the values alleged in Paragraph 40. Upon information and belief there were several versions of this document that reflect different property values shared with Essex and the Domestic Insurance Companies by Marsh during the policy purchase process. Otherwise denied.

41. Denied.

42. Admitted that Carnival's claim will exceed $41,000,000.

43. This allegation requires no response.

### ANSWER TO FOURTH CAUSE OF
### ACTION FOR DECLARATORY JUDGMENT

44. Carnival repeats its Answers to Paragraphs 1 through 28.

45. Admitted.

46. Admitted.

47. The allegation in Paragraph 47 is a legal conclusion to which Carnival does not respond.

48. Denied.

49. Admitted.

50. Admitted that the cost of construction of the Shorex Pier is estimated to be at least $2 million and that it is part of Carnival's claim. Otherwise denied.

51. Denied.

52. Denied.

53. This allegation requires no response.

### ANSWER TO FIFTH CAUSE OF
### ACTION FOR DECLARATORY JUDGMENT

54. Carnival repeats its Answers to Paragraphs 1 through 28.

55. Admitted that Carnival's claim, in part, is based upon reimbursement for the reconstruction of damaged structures and this portion of Carnival's claim is based upon replacement cost. Otherwise denied.

56. The terms and conditions of the Master Policy are contained therein; the excerpted language in Paragraph 56 is incomplete. Paragraph 56 also contains a legal conclusion to which Carnival does not respond. Otherwise denied.

57. Admitted that the construction will not be completed by October 22, 2007.

58. Paragraph 58 is a legal conclusion to which Carnival does not respond. Otherwise denied.

6

59. This allegation requires no response.

## ANSWER TO SIXTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT

60. Carnival repeats its Answers to Paragraphs 1 through 28.

61. The terms and conditions of the Policy sold by Essex are contained therein; the excerpted language in Paragraph 61 is incomplete. Otherwise denied.

62. Admitted that debris removal expenses are still being calculated at this time. Carnival is without sufficient knowledge or information to form a belief concerning the other allegations in Paragraph 62 and therefore these allegations are denied.

63. Paragraph 63 contains a legal conclusion to which Carnival does not respond. Otherwise denied.

64. This allegation requires no response.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Carnival denies each and every allegation, statement, matter, or issue in Essex's Complaint unless expressly admitted herein.

### SECOND DEFENSE

Essex fails to state a claim upon which relief can be granted.

### THIRD DEFENSE

Essex's claims may be barred in whole or in part by the doctrines of estoppel, laches, waiver, and/or unclean hands.

### FOURTH DEFENSE

If Carnival has not met or will not meet certain conditions under the policy, as alleged in Essex's claims, Essex's claims may be barred in whole or in part because Essex did not and will not suffer any prejudice from Carnival's alleged failure to meet these conditions.

## FIFTH DEFENSE

Carnival satisfied or substantially performed all conditions necessary for relief under the policy.

## SIXTH DEFENSE

Essex's claims may be barred in whole or in part because the conditions precedent in the policy are unenforceable or Carnival's performance of the conditions precedent under the policy is excused.

## SEVENTH DEFENSE

Any alleged misrepresentations were immaterial, unintentional, and caused no prejudice to Essex. Moreover, Essex did not rely upon any such alleged misrepresentations.

## EIGHTH DEFENSE

Essex's claims may be barred in whole or in part by the doctrines of forfeiture, impossibility, and/or impracticability.

## NINTH DEFENSE

Essex's claims may be barred in whole or in part by the doctrines of reformation, ratification, and/or mutual mistake.

## COUNTERCLAIMS

1. Carnival seeks a comprehensive declaration of Carnival's rights and Essex's duties and liabilities under the global, all-risk, first-party property insurance policy that Carnival purchased from Essex, which was in effect from May 1, 2005 through May 1, 2006.

2. Carnival also seeks damages from Essex for breach of contract, under Carnival's global, all-risk, first-party property insurance policy, for refusing to pay, and its asserted refusal to pay, Carnival for its losses and other damages arising out of Hurricane Wilma (the "Hurricane Wilma Losses").

## PARTIES

3. Defendant Carnival was and is a corporation organized and existing under the laws of Panama. Its principal place of business within the United States is located in Miami, Florida.

4. Plaintiff Essex Insurance Company is a Delaware corporation with its principal place of business in Glen Allen, Virginia.

## FACTUAL BACKGROUND

### Carnival Procures Its 2005-2006 Global, All-Risk, First-Party Property Insurance Program

5. In the spring of 2005, Carnival sought to purchase a global, all-risk, first-party property insurance program, including coverage for all of its properties in Mexico, with limits up to $150,000,000.

6. Carnival hired Marsh to assist with the procurement of this coverage.

7. Marsh is an insurance broker that holds itself out as being the world's leader in property risk management, offering superior insurance-market insight, global resources, and technical expertise to help its clients face the world of property risk successfully. Marsh claims to have hundreds of dedicated property professionals who serve nearly half of the *Fortune* 500 companies by providing unmatched advice and transactional capabilities. Marsh also maintains that it has specialized property expertise in every business and industry that impacts its clients.

8. Marsh approached the insurance market, and procured, on Carnival's behalf, Carnival's 2005-2006 global, all-risk, first-party property insurance program, including coverage for Carnival's properties in Mexico.

9. In prior years, Carnival had purchased two sets of first-party property insurance policies – one set of insurance policies to cover first-party property losses at its domestic locations, and another set of insurance policies to cover first-party property losses at its

9

locations in Mexico. For the 2005 policy purchase, however, Marsh suggested, among other things, that Carnival consolidate the domestic and Mexico coverages and obtain one set of global insurance policies that would provide Carnival with worldwide property insurance, including coverage for its Mexico properties. Carnival requested, among other things, that Marsh implement these suggestions, and Marsh agreed to do so.

10.    Marsh purported to procure, and represented to Carnival that it did procure, an insurance program that consolidated Carnival's global risks, including Carnival's Mexico properties, into a master global insurance program (the "Carnival Global Property Insurance Program"), to which Essex and each of the Domestic Insurance Companies subscribed.

11.    Carnival paid substantial premiums to Essex and the other Domestic Insurance Companies as consideration for these insurance policies.

12.    The Carnival Global Property Insurance Program to which Essex and the other Domestic Insurance Companies subscribed provides "all-risk" property insurance for damage and losses caused by events such as Hurricane Wilma.

13.    The insurance policy sold by IRI is a "Master Policy" that contains terms and conditions to which Essex and the other Domestic Insurance Companies agreed.

14.    The Carnival Global Property Insurance Program consists of essentially three different layers of coverage, as shown in Exhibit A attached hereto, which is incorporated by reference as if fully set forth herein, and as described in the following Paragraphs. In total, it provides $150,000,000 of insurance coverage.

15.    With respect to coverage for loss or damage to property located in Mexico, the Carnival Global Property Insurance Program was structured as described in Paragraphs 16 through 20 below. Based on Carnival's present estimate of its total Hurricane Wilma Losses, only the first two layers of coverage are likely to be at issue in this action.

16. The primary layer provides for $25,000,000 worth of coverage. The understanding of the Domestic Insurance Companies, Marsh, and Carnival was that with respect to Carnival's property in Mexico, this coverage was provided by the Carnival Global Property Insurance Program (i) as direct reinsurers of two insurance policies issued by Mexican insurance companies to Cozumel Cruise Terminals ("CCT"), Carnival's wholly-owned Mexican subsidiary that owns Carnival's Mexican locations and Concessions, up to $23,734,000, and (ii) as direct insurers of all losses in excess of that estimated value amount. Grupo Nacional Provincial ("GNP"), a Mexican insurance company, issued the GNP Policy, which covers 60% of $23,734,000; AIG Mexico, another Mexican insurance company, issued a separate policy, which covers the other 40% of those losses. (GNP and AIG Mexico collectively are referred to herein as the "Mexican Insurance Companies.") The GNP policy is directly reinsured by Commonwealth, IRI, SCOR/General Security, and Arch. These insurance companies are required to fund any payments made under the GNP policy. The AIG Mexico policy is directly reinsured by Lexington, which is required to fund any payments made under that policy. The remaining $1,266,000 of the $25,000,000 primary layer is provided by Commonwealth, IRI, SCOR/General Security, Arch, and Lexington according to the percentage shares each agreed to assume for this layer.

17. Essex, the other Domestic Insurance Companies, Marsh, and Carnival understood and agreed that the Mexican Insurance Companies would be involved in this insurance program for purely technical reasons. With respect to losses covered by the GNP and AIG Mexico policies, those insurance companies with payment obligations up to the limits of the GNP and AIG Mexico policies would be responsible under their insurance policies for making all payments for losses up to the limits of the GNP and AIG Mexico policies directly to the Mexican Insurance Companies, so that the Mexican Insurance Companies then could make

payments to Carnival's subsidiary. Thus, Carnival is the real party in interest to all agreements and understandings between the Domestic Insurance Companies and the Mexican Insurance Companies, and Essex and the Domestic Insurance Companies knew and agreed to this.

18. The second layer of coverage (or first-layer excess coverage) provides an additional $50,000,000 in coverage that is provided directly by Essex, Illinois Union, Commonwealth, IRI, SCOR/General Security, and Arch. Their respective percentage shares for this layer are reflected in Exhibit A.

19. The third layer of coverage (or second-layer excess coverage) provides an additional $75,000,000 in coverage that is provided directly by Arch, Commonwealth, Illinois Union, IRI, and SCOR/General Security. Their respective percentage shares for this layer are reflected in Exhibit A.

20. The GNP and AIG Mexico policies and each of the insurance policies sold by Essex and the other Domestic Insurance Companies provide coverage for loss and damage to Carnival's property subject to the limits of liability stated in each of the respective policies. The policies also provide coverage for, among other things, lost rent, extra expense, and other time element losses.

21. The policy numbers, periods, and limits of each of the insurance policies are identified in the schedule of insurance attached as Exhibit A.

### Hurricane Wilma Destroys the Puerta Maya Pier Terminal and Adjacent Property in Cozumel, Mexico

22. Prior to and during October 2005, Carnival, through CCT, held a property interest in the Pier and the Puerta Maya Property in Cozumel, Mexico. Carnival rented out retail space on the Puerta Maya Property to various merchants. Cruise ships anchored and docked at the Pier, and tourists visited the shops and restaurants located on the Puerta Maya Property.

23. On or about October 21 and 22, 2005, Hurricane Wilma destroyed the Pier and severely damaged adjacent property that Carnival possessed in Cozumel, Mexico.

24. Carnival also has suffered lost rent, extra expense, and other time element losses as a result of property damage caused by Hurricane Wilma. These losses are continuing.

25. Carnival also has incurred other related costs and expenses that are covered by the various provisions of the insurance policies sold by Essex and the other Domestic Insurance Companies.

26. The insurance policies sold by Essex and the other Domestic Insurance Companies obligate them to compensate Carnival for all of its Hurricane Wilma Losses, in accordance with the limits of liability in the policies.

27. The Carnival Global Property Insurance Program was intended by Carnival, Marsh, Essex, and the other Domestic Insurance Companies to provide coverage for the property damage caused by Hurricane Wilma at the Pier and the Puerto Maya Property located in Mexico.

28. Carnival estimates that its Hurricane Wilma Losses, including lost rent, at the Pier and the Puerta Maya Property located in Mexico amount to approximately $60 million.

### Carnival's Notice to Essex and the Other Domestic Insurance Companies of Its Hurricane Wilma Losses, and Their Response

29. Carnival timely provided Essex and the other Domestic Insurance Companies with notice of its Hurricane Wilma Losses.

30. Carnival also has provided, and continues to provide, Essex and the other Domestic Insurance Companies with information related to its claim, including Carnival's loss estimates.

31. To date, almost two years after Carnival incurred, and informed Essex and the other Domestic Insurance Companies of, its Hurricane Wilma Losses, Essex and the other Domestic Insurance Companies have failed to recognize the full extent of their obligations under

the insurance policies they sold to Carnival to pay for such losses, and they dispute Carnival's right to full payment of its Hurricane Wilma Losses.

32. Essex and the other Domestic Insurance Companies together notified Carnival in a letter dated October 10, 2006, that they are proceeding under a full reservation of rights. In that letter, they all have reserved their rights specifically as to eight separate matters concerning coverage for Carnival's Hurricane Wilma Losses.

33. Moreover, Essex and the other Domestic Insurance Companies have cited to particular insurance policy provisions – including a foreign territory exclusion, an occurrence limit of liability provision, a debris removal limitation, and an illegality provision – which they claim excuse them from paying for Carnival's Hurricane Wilma Losses. More specifically, they contend that their insurance policies do not provide coverage for losses incurred at foreign locations, such as Mexico.

34. Consequently, as of this date, Essex and the other Domestic Insurance Companies have not paid, and have asserted a refusal to pay, Carnival in full for its Hurricane Wilma Losses.

35. Essex's anticipated failure to honor its obligations under the policy it sold to Carnival forced Carnival to bring these counterclaims to seek to recover amounts to which it is entitled under the insurance policy.

## COUNTERCLAIM I - DECLARATORY JUDGMENT

36. Carnival realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 35 as if fully set forth herein.

37. Essex is obligated to pay for Carnival's Hurricane Wilma Losses under the insurance policy that it sold to Carnival.

38. Carnival has complied with all terms and conditions contained in the insurance policy, except to the extent its performance has been or is excused by Essex's conduct.

39. Carnival contends that no exclusions in the insurance policy bar coverage for any of its Hurricane Wilma Losses.

40. Essex has contested, refused, or otherwise failed, to honor the totality of its obligations to pay for Carnival's Hurricane Wilma Losses.

41. An actual and justiciable controversy currently exists between Carnival and Essex with respect to Essex's duties and obligations under the insurance policy, and the availability and scope of coverage for Carnival's Hurricane Wilma Losses.

42. Carnival thus seeks a judicial determination that Essex is contractually obligated to pay for Carnival's Hurricane Wilma Losses, up to its policy limits, and that because of Essex's conduct in refusing to acknowledge or to honor its coverage obligations, Carnival is excused from performing or complying with any conditions and duties otherwise imposed on it by the insurance policy sold to it by Essex. A judicial determination is necessary at this time so the parties' dispute may be resolved and that the parties may be aware of their respective rights and duties.

## COUNTERCLAIM II - BREACH OF CONTRACT

43. Carnival reasserts the allegations of Paragraphs 1 through 42 as if fully set forth herein.

44. Essex has breached the terms of the insurance policy that it sold to Carnival in the following ways:

    a. It has failed adequately to investigate, or promptly to respond to, Carnival's demand for payment of Carnival's Hurricane Wilma Losses; and

15

      b.    It has asserted its refusal to pay for any of Carnival's Hurricane Wilma Losses.

47. As a direct and proximate result of Essex's breach of contract, which is continuing at the date of these Counterclaims, Essex has deprived Carnival of the benefit of the insurance coverage for which Carnival has paid substantial premiums.

46. As a direct and proximate result of Essex's breach of contract, Carnival has sustained and will continue to sustain substantial monetary damages, including substantial unreimbursed property losses, including the costs of cleaning up, repairing, replacing, and rebuilding damaged or destroyed property, and lost rent, extra expense, and other time element losses, as well as attorney's fees associated with this action.

## COUNTERCLAIM III – REFORMATION BASED ON MUTUAL MISTAKE

47. Carnival reasserts the allegations of Paragraphs 1 through 46 as if fully set forth herein.

48. If and to the extent that the Master Policy does not provide coverage for Carnival's Mexican properties up to full policy limits of $150,000,000, then the Master Policy does not reflect the true intent of Carnival, Essex, and the other Domestic Insurance Companies. This result is based upon the mutual mistake of Carnival, Essex, and the other Domestic Insurance Companies. Essex's and Carnival's true agreement was that the Master Policy, an all-risk, global, first-party property insurance policy, would cover Carnival's Mexican properties up to full policy limits of $150,000,000 and that Essex, as a subscribing insurer, would provide coverage for its full share of a covered loss. Therefore, if, and to the extent that, Essex's contention that the Master Policy, as written, does not provide coverage for Carnival's Mexican properties up to full policy limits of $150,000,000, is correct, then the Master Policy should be reformed to provide such coverage, and to the extent necessary, any language in the policy that

Essex now contends defeats coverage for Carnival's Mexican properties up to full policy limits should be deleted.

## **PRAYER FOR RELIEF**

WHEREFORE, Carnival requests a judgment against Essex as follows:

    a.    On Counterclaim I, that this Court determine and declare that Essex is obligated under the insurance policy it sold to Carnival to pay for Carnival's Hurricane Wilma Losses, subject to policy limits;

    b.    On Counterclaim II, for damages in an amount to be determined at trial;

    c.    On Counterclaim III, that this Court determine that the Master Policy be reformed, if necessary, so that it covers Carnival's Mexican locations up to full policy limits of $150,000,000;

    d.    On all claims for relief, for reasonable attorney's fees, interest, costs, and the expenses of this action; and

    e.    For such other and further relief as this Court deems just and proper.

Dated this 13th day of November 2007.

                Respectfully submitted,

                s/Barry J. Fleishman
                Barry J. Fleishman (admitted *pro hac vice*)
                fleishmanb@dicksteinshapiro.com
                Erica J. Dominitz (admitted *pro hac vice*)
                dominitze@dicksteinshapiro.com
                DICKSTEIN SHAPIRO LLP
                1825 Eye Street, NW
                Washington, DC 20006
                (202) 420-2200

                *Attorneys for Defendant*
                *Carnival Corporation*

**EXHIBIT A**
**Schedule of Insurance Policies**

| Insurance Company | Policy Number | Policy Period | Participation | Policy Limits |
|---|---|---|---|---|
| IRI | 31-3-70785 | 5/1/05-5/1/06 | 16.5% p/o $150,000,000 | $24,750,000 p/o $150,000,000 |
| Lexington | 8754113 | 5/1/05-5/1/06 | 40% p/o $25,000,000 | $10,000,000 p/o $25,000,000 |
| Commonwealth | US 5689 | 5/1/05-5/1/06 | 18.5% p/o $25,000,000 | $4,625,000 p/o $25,000,000 |
| | US 5690 | 5/1/05-5/1/06 | Alaska only | Alaska only |
| | US 5691 | 5/1/05-5/1/06 | 6% p/o $50,000,000 xs $25,000,000 | $3,000,000 p/o $50,000,000 xs $25,000,000 |
| | US 5692 | 5/1/05-5/1/06 | 20% p/o $75,000,000 xs $75,000,000 | $15,000,000 p/o $75,000,000 xs $75,000,000 |
| Arch | PRP 000 7453 00 | 5/1/05-5/1/06 | 10% p/o $150,000,000 | $15,000,000 p/o $150,000,000 |
| | | | 20% p/o $75,000,000 xs $75,000,000 | $15,000,000 p/o $75,000,000 xs $75,000,000 |
| SCOR/General Security | 25F39000197-05 | 5/1/05-5/1/06 | 15% p/o $150,000,000 | $22,500,000 p/o $150,000,000 |
| Illinois Union | D3590427A 001 | 5/1/05-5/1/06 | 27.5% p/o $50,000,000 xs $25,000,000 | $13,750,000 p/o $50,000,000 xs $25,000,000 |
| | D35904232 001 | 5/1/05-5/1/06 | 18.5% p/o $75,000,000 xs $75,000,000 | $13,875,000 p/o $75,000,000 xs $75,000,000 |
| Essex | ESP3446 | 5/1/05-5/1/06 | 25% p/o $50,000,000 xs $25,000,000 | $12,500,000 p/o $50,000,000 xs $25,000,000 |